1

2

3

4

5

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT TACOMA

6

7

8

9

10

11

VIRGIL W. BOHALL,

                              Plaintiff,

        v.

MICHAEL J. ASTRUE, Commissioner of
Social Security,

                              Defendant.

Case No. C09-5479KLS

ORDER AFFIRMING THE
COMMISSIONER'S DECISION TO
DENY BENEFITS

12

13

14

15

16

17

18

19

20

        Plaintiff, Virgil W. Bohall, has brought this matter for judicial review of the denial of his

applications for disability insurance and supplemental security income ("SSI") benefits.  The

parties have consented to have this matter heard by the undersigned Magistrate Judge pursuant to

28 U.S.C. § 636(c), Federal Rule of Civil Procedure 73 and Local Rule MJR 13.  After reviewing

the parties' briefs and the remaining record, the undersigned hereby finds and ORDERS:

21

                         FACTUAL AND PROCEDURAL HISTORY

22

23

24

25

        Plaintiff currently is 43 years old.[1] Tr. 28.  He has a general equivalency diploma and

past relevant work experience as a forklift operator, an iron worker, a machine molder, a janitor,

and a planer operator. Tr. 25, 72, 90, 465.

26

        [1] Plaintiff's date of birth has been redacted in accordance with the General Order of the Court regarding
Public Access to Electronic Case Files, pursuant to the official policy on privacy adopted by the Judicial Conference
of the United States.

ORDER - 1

Plaintiff filed an application for disability insurance on April 3, 2006, and another one for SSI benefits on April 5, 2006, alleging disability as of December 31, 2004, due to problems with his right arm and neck, a blind right eye, headaches, and "mental issues". Tr. 16, 54, 89, 443, 446, 450-51.  His applications were denied initially and on reconsideration. Tr. 16, 28-29, 45, 48. A hearing was held before an administrative law judge ("ALJ") on April 29, 2008, at which plaintiff, represented by counsel, appeared and testified, as did a vocational expert. Tr. 460-94.

On August 15, 2008, the ALJ issued a decision, in which he determined plaintiff to be not disabled, finding specifically in relevant part:

(1)    at step one of the sequential disability evaluation process,[2] plaintiff had not engaged in substantial gainful activity since his alleged onset date of disability;

(2)    at step two, plaintiff had "severe" impairments consisting of chronic myofascial pain, right shoulder impingement syndrome, right eye blindness, pedophilia, and a history of depression;

(3)    at step three, none of plaintiff's impairments met or equaled the criteria of any of those listed in 20 C.F.R. Part 404, Subpart P, Appendix 1;

(4)    after step three but before step four, plaintiff had the residual functional capacity ("RFC") to perform light work, with certain additional non-exertional limitations;

(5)    at step four, plaintiff was unable to perform his past relevant work; and

(6)    at step five, plaintiff was capable of performing other jobs existing in significant numbers in the national economy.

Tr. 16-27.  Plaintiff's request for review was denied by the Appeals Council on July 1, 2009, making the ALJ's decision the Commissioner's final decision. Tr.6; 20 C.F.R. § 404.981, § 416.1481.

---

[2] The Commissioner employs a five-step "sequential evaluation process" to determine whether a claimant is disabled. See 20 C.F.R. § 404.1520; 20 C.F.R. § 416.920.  If the claimant is found disabled or not disabled at any particular step, the disability determination is made at that step, and the sequential evaluation process ends. Id.

On August 5, 2009, plaintiff filed a complaint in this Court seeking review of the ALJ's decision. (Dkt. #1-#3). The administrative record was filed with the Court on October 20, 2009. (Dkt. #12). Plaintiff argues the ALJ's decision should be reversed and remanded to the Commissioner for an award of benefits or, in the alternative, for further administrative proceedings, for the following reasons:

    (a)    the ALJ erred in evaluating the medical evidence in the record;

    (b)    the ALJ erred in assessing plaintiff's credibility;

    (c)    the ALJ erred in evaluating the lay witness evidence in the record;

    (d)    the ALJ erred in assessing plaintiff's residual functional capacity; and

    (e)    the ALJ erred in finding plaintiff capable of performing other work existing in significant numbers in the national economy.

For the reasons set forth below, the undersigned disagrees that the ALJ erred in determining plaintiff to be not disabled, and therefore recommends the ALJ's decision be affirmed.

## DISCUSSION

This Court must uphold the Commissioner's determination that plaintiff is not disabled if the Commissioner applied the proper legal standard and there is substantial evidence in the record as a whole to support the decision. Hoffman v. Heckler, 785 F.2d 1423, 1425 (9th Cir. 1986). Substantial evidence is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. Richardson v. Perales, 402 U.S. 389, 401 (1971); Fife v. Heckler, 767 F.2d 1427, 1429 (9th Cir. 1985). It is more than a scintilla but less than a preponderance. Sorenson v. Weinberger, 514 F.2d 1112, 1119 n.10 (9th Cir. 1975); Carr v. Sullivan, 772 F. Supp. 522, 524-25 (E.D. Wash. 1991). If the evidence admits of more than one rational interpretation, the Court must uphold the Commissioner's decision. Allen v. Heckler, 749 F.2d 577, 579 (9th Cir. 1984).

ORDER - 3

I.      The ALJ Properly Evaluated the Medical Evidence in the Record

        The ALJ is responsible for determining credibility and resolving ambiguities and conflicts in the medical evidence. Reddick v. Chater, 157 F.3d 715, 722 (9th Cir. 1998).  Where the medical evidence in the record is not conclusive, "questions of credibility and resolution of conflicts" are solely the functions of the ALJ. Sample v. Schweiker, 694 F.2d 639, 642 (9th Cir. 1982).  In such cases, "the ALJ's conclusion must be upheld." Morgan v. Commissioner of the Social Security Administration, 169 F.3d 595, 601 (9th Cir. 1999).  Determining whether inconsistencies in the medical evidence "are material (or are in fact inconsistencies at all) and whether certain factors are relevant to discount" the opinions of medical experts "falls within this responsibility." Id. at 603.

        In resolving questions of credibility and conflicts in the evidence, an ALJ's findings "must be supported by specific, cogent reasons." Reddick, 157 F.3d at 725.  The ALJ can do this "by setting out a detailed and thorough summary of the facts and conflicting clinical evidence, stating his interpretation thereof, and making findings." Id.  The ALJ also may draw inferences "logically flowing from the evidence." Sample, 694 F.2d at 642.  Further, the Court itself may draw "specific and legitimate inferences from the ALJ's opinion." Magallanes v. Bowen, 881 F.2d 747, 755, (9th Cir. 1989).

        The ALJ must provide "clear and convincing" reasons for rejecting the uncontradicted opinion of either a treating or examining physician. Lester v. Chater, 81 F.3d 821, 830 (9th Cir. 1996).  Even when a treating or examining physician's opinion is contradicted, that opinion "can only be rejected for specific and legitimate reasons that are supported by substantial evidence in the record." Id. at 830-31.  However, the ALJ "need not discuss all evidence presented" to him or her. Vincent on Behalf of Vincent v. Heckler, 739 F.2d 1393, 1394-95 (9th Cir. 1984) (citation

ORDER - 4

omitted) (emphasis in original).  The ALJ must only explain why "significant probative evidence has been rejected." Id.; see also Cotter v. Harris, 642 F.2d 700, 706-07 (3rd Cir. 1981); Garfield v. Schweiker, 732 F.2d 605, 610 (7th Cir. 1984).

In general, more weight is given to a treating physician's opinion than to the opinions of those who do not treat the claimant. Lester, 81 F.3d at 830.  On the other hand, an ALJ need not accept the opinion of a treating physician, "if that opinion is brief, conclusory, and inadequately supported by clinical findings" or "by the record as a whole." Batson v. Commissioner of Social Security Administration, 359 F.3d 1190, 1195 (9th Cir. 2004); Thomas v. Barnhart, 278 F.3d 947, 957 (9th Cir. 2002); Tonapetyan v. Halter, 242 F.3d 1144, 1149 (9th Cir. 2001).  An examining physician's opinion is "entitled to greater weight than the opinion of a nonexamining physician." Lester, 81 F.3d at 830-31.  A non-examining physician's opinion may constitute substantial evidence if "it is consistent with other independent evidence in the record." Id. at 830-31; Tonapetyan, 242 F.3d at 1149.

A.      Dr. Bremer

A psychologic/psychiatric evaluation form was completed by Jeffrey Bremer, Ph.D., in early February 2008, in which he assessed plaintiff with a number of mental diagnoses, including recurrent major depression. Tr. 318.  Dr. Bremer also found plaintiff to be severely limited (meaning an "inability to perform one or more basic work-related activities") in his ability to interact appropriately in public contacts, markedly limited (meaning a "[v]ery significant interference with basic work-related activities") in his ability to relate appropriately to co-workers and supervisors and in his ability to respond appropriately to and tolerate the pressure and expectations of a normal work setting, and moderately limited (meaning a "[s]ignificant interference with basic work-related activities") in his ability to control his physical or motor

ORDER - 5

movements and maintain appropriate behavior. Tr. 317, 319.

In his decision, the ALJ stated he gave "little weight to Dr. Bremer's assessment of [the above] social factors, as it was based on" plaintiff's report that he was "severely avoidant, a loner and reclusive," and because Dr. Bremer "apparently was not aware that" plaintiff lived "with or next door to his girlfriend and that he interact[ed] with his family members and his girlfriends' children." Tr. 25. Plaintiff argues the ALJ erred in so finding, asserting Dr. Bremer's findings are consistent both with a global assessment of functioning ("GAF") score of 45[3] assessed by a mental health clinic in early April 2007, and with the observations of Daryl Conklin, PA-C, his primary treatment provider. The undersigned disagrees the ALJ erred here.

First, a medical source's opinion premised on a claimant's subjective complaints may be discounted where the record supports the ALJ in discounting the claimant's credibility. See Tonapetyan, 242 F.3d at 1149; Morgan v. Commissioner of the Social Security Administration, 169 F.3d 595, 601 (9th Cir. 1999) (opinion of physician premised to large extent on claimant's own accounts of her symptoms and limitations may be disregarded where those complaints have been properly discounted). As discussed in greater detail below, the ALJ properly discounted plaintiff's credibility in this case. The ALJ, therefore, did not err in rejecting the findings of Dr. Bremer in part on this basis. In addition, the fact that Dr. Bremer appears not to have been aware of the social interactions noted by the ALJ, also certainly calls into question the marked to severe social functional limitations Dr. Bremer assessed.

As noted above, plaintiff argues Dr. Bremer's findings are consistent with the GAF score

---

[3] A GAF is "a subjective determination based on a scale of 100 to 1 of 'the clinician's judgment of the individual's overall level of functioning.'" Pisciotta v. Astrue, 500 F.3d 1074, 1076 n.1 (10th Cir. 2007). It is "relevant evidence" of a claimant's ability to function mentally. England v. Astrue, 490 F.3d 1017, 1023 n. 8 (10th Cir. 2007). "A GAF score of 41-50 indicates '[s]erious symptoms . . . [or] serious impairment in social, occupational, or school functioning,' such as an inability to keep a job." Pisciotta, 500 F.3d at 1076 n.1 (quoting Diagnostic and Statistical Manual of Mental Disorders (Text Revision 4th ed. 2000) ("DSM-IV-TR") at 34); see also Cox v. Astrue, 495 F.3d 614, 620 n.5 (8th Cir. 2007).

ORDER - 6

1   of 45.  But to the extent that GAF score is based on problems with social functioning – and thus

2   relevant to the evaluation of Dr. Bremer's own findings – it appears to have been obtained once

3   more from plaintiff's own self-report with respect thereto. See Tr. 311, 313.  The ALJ, therefore,

4   also would have been within his authority to discount the above GAF score for the same reason –

5   plaintiff's lack of credibility – he did Dr. Bremer's findings.  The same certainly would seem to

6   be true in regard to Mr. Conklin's stated opinion in late May 2008, that "subsequent to February,

7   2007," plaintiff was experiencing "significant social withdrawal," as none of his treatment notes

8   for the relevant time period contain any objective clinical findings in support thereof. Tr. 280-89,

9   391, 387, 393-97, 399-401, 403-04, 406-07, 423.

10

11          Mr. Conklin did further state that he had "had an opportunity to observe" plaintiff both

12  "in the clinic during treatment sessions" and "in the rural community in which" they both

13  resided, and that on this basis, he believed plaintiff's subjective complaints were "credible and

14  honestly reflect[ed] how he [felt] at the time" he reported his symptoms. Tr. 421-22.  However,

15  there are no specific instances of significant limitations in plaintiff's ability to function socially

16  reported by Mr. Conklin.  In addition, regardless of whether or not Mr. Conklin believed plaintiff

17  to be honest, it is the ALJ who is solely responsible for determining issues of credibility, and

18  again, as noted above, the ALJ properly did so in this case. See Sample v. Schweiker, 694 F.2d

19  639, 642 (9th Cir. 1982); Allen, 749 F.2d at 579-80.

20

21          B.      Dr. Kemp

22

23          Another psychological/psychiatric evaluation form was completed by Fred Kemp, Ph.D.,

24  in early February 2007, in which plaintiff was diagnosed with depression, anxiety and possible

25  social phobia. Tr. 270.  Based on those diagnoses, Dr. Kemp found plaintiff to be moderately

26  limited in his ability to understand, remember and follow complex instructions, learn new tasks,

ORDER - 7

interact appropriately in public contacts, and respond appropriately to and tolerate the pressure

and expectations of a normal work setting. Tr. 271.  Dr. Kemp further stated that mental health

intervention in the form of medication and therapy was likely to restore or substantially improve

plaintiff's ability to work for pay in a regular and predictable manner. Tr. 272.

With respect to Dr. Kemp's opinion, the ALJ found as follows:

> I give weight to Dr. Kemp's assessment, to the extent it is consistent with the
> ability to understand, remember and carry out simple or complex tasks and
> make judgments in a work setting with occasional interactions with coworkers
> and supervisors and superficial interaction with members of the public.
> Otherwise, to the extent Dr. Kemp relied on the claimant's subjective
> complaints in forming his opinion, that opinion is discounted.  I note also that
> Dr. Kemp reported only a mild impairment on mental status examination, a
> finding that is inconsistent with the assessed cognitive limitations.

Tr. 25.  Plaintiff argues the ALJ erred in so finding, asserting he turned "the adjudicative process

on its head." (Dkt. #13, p. 17).  Specifically, plaintiff asserts that by stating he was rejecting Dr.

Kemp's assessment to the extent it was inconsistent with his assessment of plaintiff's residual

functional capacity, he in effect was determining the RFC prior to actually considering all of the

medical evidence in the record and giving appropriate weight thereto.  This argument is entirely

without merit.  The phrasing the ALJ used here is merely a different way of stating the record did

not support the more severe limitations found by Dr. Kemp.  There simply is no indication the

ALJ instead assessed plaintiff's residual functional capacity without having first considered the

relevant medical and other evidence in the record.

As did Dr. Bremer, Dr. Kemp appears to have based the moderate limitations he found in

plaintiff's social functioning – that is in regard to interacting appropriately in public contacts and

responding appropriately to and tolerating the pressure and expectations of a normal work setting

– on his self-reported subjective complaints.  See Tr. 270-71.  Thus, here too the ALJ did not err

in discounting Dr. Kemp's findings in part on this basis.  The ALJ, furthermore, also properly

ORDER - 8

noted that the moderate cognitive limitations Dr. Kemp found were inconsistent with the mental

status examination performed at the time, which revealed only a "mild impairment." Tr. 269,

271.  This as well was a valid basis for rejecting the limitations assessed by Dr. Kemp to the

extent they did not accord with the ALJ's assessed RFC. See Batson, 359 F.3d at 1195 (ALJ

need not accept opinion of treating physician if inadequately supported by clinical findings); see

also Bayliss v. Barnhart, 427 F.3d 1211, 1216 (9th Cir. 2005) (discrepancies between medical

opinion source's functional assessment and that source's clinical notes, recorded observations

and other comments regarding claimant's capabilities constitutes clear and convincing reason for

not relying on that assessment); Weetman v. Sullivan, 877 F.2d 20, 23 (9th Cir. 1989).

    Lastly, as he did with respect to the ALJ's determination concerning the limitations Dr.

Bremer found, plaintiff argues those limitations are consistent with the GAF score of 45 noted

above and the observations of Mr. Conklin.  However, for the same reasons that argument was

without merit in regard to Dr. Bremer, so too is it meritless here.  Accordingly, the ALJ also did

not err in discounting the functional limitations opined to by Dr. Kemp to the extent those

limitations were inconsistent with the residual functional capacity, discussed below, with which

the ALJ assessed plaintiff.

    C.    Mr. Conklin

    The record contains a sworn statement, dated May 27, 2008, from Daryl Conklin, PA-C,

plaintiff's primary treatment provider, in which Mr. Conklin stated plaintiff had "a combination

of significant medical and psychological difficulties" that were "chronic in nature", including

right shoulder impingement and rotator cuff disease, cervical degenerative disc disease with

radiculopathy, chronic headaches, and "severe symptoms of depression." Tr. 421-22.  As noted

above, Mr. Conklin also stated that based on his "experience" as plaintiff's primary treatment

ORDER - 9

provider, he believed plaintiff's subjective complaints were "credible" and "honestly" reflected how he felt when he reported his symptoms. Tr. 422.  Mr. Conklin concluded his statement with the following opinions regarding plaintiff's ability to work:

> . . . It it my opinion based on my treatment experience with Mr. Bohall that, on a physical basis, he is limited to sedentary work activity which requires only the occasional use of his right arm and/or hand.  Prior to February, 2007, it is my opinion that Mr. Bohall would have more probably than not been able to sustain work activity within those limitations.  Subsequent to February, 2007, however, it is my opinion that Mr. Bohall's psychological impairments, in combination with his physical problems, would have prevented him from being able to sustain work activity at even that reduced exertional level.  It is my opinion that subsequent to February, 2007, Mr. Bohall would not have been able to attend work on a regular and reliable basis because of his chronic pain and significant social withdrawal.  At this point in time Mr. Bohall's prognosis is guarded in light of the chronicity of his impairments and his failure to respond positively to prior treatment.

Tr. 422-23.

> With respect to these opinions, the ALJ found in relevant part as follows:

> I give little evidentiary weight to Mr. Conklin's opinions, in part because the diagnosis of cervical disc herniation with radiculopathy is not established in the medical evidence of record.  In addition, examination findings do [sic] support the degree of impairment alleged.  It appears that at times Mr. Conklin has carried forward a diagnostic assessment rather than basing the assessment on cur017ect objective medical evidence.  For example, in September 2007 he noted muscle spasms of the paravertebral musculature.  Several subsequent examination reports did not show a finding of muscle spasms, yet the diagnostic assessment continued to include muscle spasms . . .  I note also that Mr. Conklin is not an acceptable medical source as defined by the Social Security regulations, nor is he qualified to offer an opinion regarding the claimant's mental limitations.

Tr. 24.  Plaintiff argues the ALJ erred in so finding, first asserting that the ALJ cannot discount Mr. Conklin's opinions because he is not an acceptable medical expert or qualified to offer an opinion concerning his mental limitations.  The undersigned agrees these are not valid bases for discounting Mr. Conklin's opinions.  First, it is true that as a physician's assistant Mr. Conklin, is not an "acceptable medical source" as that term is defined in the Social Security Regulations, and

ORDER - 10

thus his opinions may be given less weight than those of acceptable medical sources. See Gomez v. Chater, 74 F.3d 967, 970-71 (9th Cir. 1996); 20 C.F.R. § 404.1513(a), (d), § 416.913(a), (d) (acceptable medical sources include licensed physicians and licensed or certified psychologists). Evidence from "other sources," including other "medical sources" such as nurse practitioners, however, may be used to "show the severity" of a claimant's impairments and their effect on the claimant's ability to work. 20 C.F.R. § 404.1513(d), § 416.913(d); see also Sprague v. Bowen, 812 F.2d 1226 (9th Cir. 1987) (citing 20 C.F.R. § 404.1513(e)(2)).

On the other hand, while those Social Security Regulations "provide specific criteria for evaluating medical opinions from 'acceptable medical sources'; . . . they do not explicitly address how to consider relevant opinions and other evidence from" other medical sources listed in 20 C.F.R. § 404.1513(d) and 20 C.F.R. § 416.913(d). Social Security Ruling ("SSR") 06-03p, 2006 WL 2329939 *3; 20 C.F.R. § 404.1527(a), (d), § 416.927(a), (d).[4]  SSR 06-03p was issued on August 9, 2006, however, for the purpose of clarifying how opinions from such other medical sources will be considered:

> . . . With the growth of managed health care in recent years and the emphasis on containing medical costs, medical sources who are not "acceptable medical

---

[4] The specific criteria for evaluating the opinions of acceptable medical sources include the following:

- The examining relationship between the individual and the "acceptable medical source";
- The treatment relationship between the individual and a treating source, including its length, nature, and extent as well as frequency of examination;
- The degree to which the "acceptable medical source" presents an explanation and relevant evidence to support an opinion, particularly medical signs and laboratory findings;
- How consistent the medical opinion is with the record as a whole;
- Whether the opinion is from an "acceptable medical source" who is a specialist and is about medical issues related to his or her area of specialty; and
- Any other factors brought to our attention, or of which we are aware, which tend to support or contradict the opinion. For example, the amount of understanding of our disability programs and their evidentiary requirements that an "acceptable medical source" has, regardless of the source of that understanding, and the extent to which an "acceptable medical source" is familiar with the other information in the case record, are all relevant factors that we will consider in deciding the weight to give to a medical opinion.

SSR 06-03p, 2006 WL 2329939 *2-*3; 20 C.F.R. § 404.1527(d), § 416.927(d).

ORDER - 11

sources," such as nurse practitioners, physician assistants, and licensed
clinical social workers, have increasingly assumed a greater percentage of the
treatment and evaluation functions previously handled primarily by physicians
and psychologists. Opinions from these medical sources, who are not
technically deemed "acceptable medical sources" under our rules, are
important and should be evaluated on key issues such as impairment severity
and functional effects, along with the other relevant evidence in the file. . . .

. . .

The fact that a medical opinion is from an "acceptable medical source" is a
factor that may justify giving that opinion greater weight than an opinion from
a medical source who is not an "acceptable medical source" because . . .
"acceptable medical sources" "are the most qualified health care
professionals." However, depending on the particular facts in a case, and after
applying the factors for weighing opinion evidence, an opinion from a medical
source who is not an "acceptable medical source" may outweigh the opinion
of an "acceptable medical source," including the medical opinion of a treating
source. For example, it may be appropriate to give more weight to the opinion
of a medical source who is not an "acceptable medical source" if he or she has
seen the individual more often than the treating source and has provided better
supporting evidence and a better explanation for his or her opinion. Giving
more weight to the opinion from a medical source who is not an "acceptable
medical source" than to the opinion from a treating source does not conflict
with the treating source rules in 20 CFR 404.1527(d)(2) and 416.927(d)(2)
and SSR 96-2p, "Titles II and XVI: Giving Controlling Weight To Treating
Source Medical Opinions."

SSR 06-03p, 2006 WL 2329939 *3-*5.  The ALJ therefore erred in discounting Mr. Conklin's

opinions because he was not an acceptable medical source, particularly as the record shows Mr.

Conklin to have been plaintiff's main treatment provider.

    The undersigned also agrees with plaintiff that the ALJ erred in stating that the diagnosis

of cervical disc herniation with radiculopathy was "not established in the medical evidence in the

record." Tr. 24.  The record does contain clear evidence of such a diagnosis.  Rajesh G. Arakal,

M.D., an orthopedic specialist, provided this diagnosis in early February 2006. Tr. 240, 244, 247.

Another physician, David Slack, M.D., also diagnosed plaintiff with that condition in early April

2007, and again in early May 2007, and mid-October 2007. Tr. 343, 351, 354-55.  Accordingly,

ORDER - 12

while not every medical opinion source in the record has so diagnosed plaintiff (see Tr. 160, 165, 188, 198-200, 204-07, 210, 215, 225), the record does contain significant probative evidence that the diagnosis has been made.

Nevertheless, the ALJ did provide two valid reasons for rejecting Mr. Conklin's opinions. First, the record supports the ALJ's statement that Mr. Conklin's examination findings "do [not] support the degree of impairment alleged."[5] Tr. 24.  Indeed, although plaintiff was seen by Mr. Conklin on a number of occasions over the nearly four-year period during which the treatment relationship lasted, none of the objective clinical findings set forth in Mr. Conklin's treatment notes indicates plaintiff's physical and/or mental impairments would have prevented him from being able work at the level found by the ALJ, let alone on a regular and reliable basis. See Tr. 194, 214, 227-32, 238-39, 252-54, 257-60, 266, 281, 284-85, 287, 387, 391, 393-97, 399-401, 403-04, 406-07, 410, 413.

Second, the record also indicates, as noted by the ALJ, that Mr. Conklin appears to have "carried forward a diagnostic assessment" of muscle spasms, without objective clinical findings to indicate the presence thereof. See Tr. 24, 391, 395-96.  This discrepancy does at least call into some question the validity of that diagnosis. See Bayliss, 427 F.3d at 1216; Batson, 359 F.3d at 1195; Weetman, 877 F.2d at 23.  Even if this alone would not be a sufficient basis upon which the ALJ could reject Mr. Conklin's opinions, as just discussed, the ALJ's determination that the lack of objective medical evidence to support those opinions is.  Accordingly, for this reason the undersigned finds the ALJ did not err in doing so here.

II.    The ALJ Did Not Err in Discounting Plaintiff's Credibility

---

[5] Plaintiff argues that because the relevant portion of the ALJ's decision reads "examination findings do support the degree of impairment alleged," the ALJ in fact so found, and thus had no reason to reject Mr. Conklin's opinions. Tr. 24 (emphasis added).  However, it is obvious that when read in context of the paragraph as a whole in which it appears, that language was intended to be stated in the negative.  That is, there is little question that the actual intent of the ALJ was to state that the examination findings did not support the degree of impairment alleged.

ORDER - 13

Questions of credibility are solely within the control of the ALJ.  Sample, 694 F.2d at 642.  The Court should not "second-guess" this credibility determination.  Allen, 749 F.2d at 580.  In addition, the Court may not reverse a credibility determination where that determination is based on contradictory or ambiguous evidence.  Id. at 579.  That some of the reasons for discrediting a claimant's testimony should properly be discounted does not render the ALJ's determination invalid, as long as that determination is supported by substantial evidence.  Tonapetyan v. Halter, 242 F.3d 1144, 1148 (9th Cir. 2001).

To reject a claimant's subjective complaints, the ALJ must provide "specific, cogent reasons for the disbelief."  Lester v. Chater, 81 F.3d 821, 834 (9th Cir. 1996) (citation omitted).  The ALJ "must identify what testimony is not credible and what evidence undermines the claimant's complaints."  Id.; Dodrill v. Shalala, 12 F.3d 915, 918 (9th Cir. 1993).  Unless affirmative evidence shows the claimant is malingering, the ALJ's reasons for rejecting the claimant's testimony must be "clear and convincing."  Lester, 81 F.2d at 834.  The evidence as a whole must support a finding of malingering.  O'Donnell v. Barnhart, 318 F.3d 811, 818 (8th Cir. 2003).

In determining a claimant's credibility, the ALJ may consider "ordinary techniques of credibility evaluation," such as reputation for lying, prior inconsistent statements concerning symptoms, and other testimony that "appears less than candid."  Smolen v. Chater, 80 F.3d 1273, 1284 (9th Cir. 1996).  The ALJ also may consider a claimant's work record and observations of physicians and other third parties regarding the nature, onset, duration, and frequency of symptoms.  Id.

In this case, the ALJ found plaintiff's "statements concerning the intensity, persistence and limiting effects of" his symptoms to be not entirely credible for the following reasons:

ORDER - 14

In terms of the claimant's physical impairments, objective testing has not supported the degree of alleged symptoms.  For example, he alleges that he cannot use his right hand, yet recent diagnostic testing was negative for carpal tunnel syndrome, he does not have cervical spine disease, his neurologic exams have been normal, and he has only a small spur in the shoulder.  The claimant is blind in the right eye; however, the evidence shows that he has worked successfully at multiple jobs requiring visual acuity.  He has reported daily headaches since childhood; again, he has been able to work in spite of that impairment.  In addition, Dr. Slack's records show at least some improvement with the headaches with medication.  The allegations of poor balance related to headaches are not documented in the medical evidence of record; for example, on physical therapy evaluation to assess balance problems his balance was normal.  The claimant told Dr. [Anjan] Sattar[, M.D.,] that he has cervical spine stenosis, a finding that is not documented in the record.  To the contrary, the claimant's MRI scan of the cervical spine was normal.  His receipt of unemployment insurance compensation in 2005 is inconsistent with his allegations of disability.

Tr. 23.  Plaintiff argues these are not valid reasons for discounting his credibility.  Once more, the undersigned disagrees.

A determination that a claimant's complaints are "inconsistent with clinical observations" can satisfy the clear and convincing requirement.  Regennitter v. Commissioner of SSA, 166 F.3d 1294, 1297 (9th Cir. 1998).  As discussed above in regard to Mr. Conklin's opinions that plaintiff was incapable of sustaining work activity or at the level assessed by the ALJ, the ALJ properly noted the lack of objective clinical evidence to support those opinions.  Indeed, the other medical sources in record who opined on the issue – all of whom, it should be mentioned, were licensed physicians – found plaintiff to be capable of at least a modified range of light work substantially consistent with the ALJ's RFC assessment discussed below.  See Tr. 157, 166, 189.

True, a claimant's subjective complaints may not be rejected "solely because the degree of [severity] alleged is not supported by objective medical evidence."  Orteza v. Shalala, 50 F.3d 748, 749-50 (9th Cir. 1995) (quoting Bunnell v. Sullivan, 947 F.2d 341, 346-47 (9th Cir.1991) (en banc)) (emphasis added); see also Rollins v. Massanari, 261 F.3d 853, 856 (9th Cir.2001);

ORDER - 15

Byrnes v. Shalala, 60 F.3d 639, 641-42 (9th Cir. 1995); Fair v. Bowen, 885 F.2d 597, 601 (9th Cir. 1989).  As discussed below, however, the inconsistency between plaintiff's complaints and the objective medical evidence in the record is not the only clear and convincing reason the ALJ provided for discounting his credibility.

It also is true that carpal tunnel syndrome is not the only physical impairment that could result in plaintiff's alleged inability to use his right hand, but plaintiff has pointed to no objective clinical findings supporting such a limitation.  Plaintiff points to evidence in the record from his treating and examining medical sources indicating that his right shoulder impingement diagnosis has resulted in some limitations in his use of that hand. SeeTr. 166, 189, 195, 267, 282, 288, 421-22.  None of these sources, though, including Mr. Conklin, ever found plaintiff to be completely unable to use his right hand.  Rather, that evidence largely shows he is limited in his use thereof on only an occasional basis. See id.

Plaintiff also finds fault with the ALJ's finding that he had been able to work despite his blind right eye. See Tr. 23.  Specifically, plaintiff states he finds this determination confusing, because the ALJ also accepted his right eye blindness as a "severe" impairment, and because the ALJ determined he could not perform any jobs requiring bilateral visual acuity. See Tr. 18, 22.  Merely because the vision problems he reported did not precisely match the ALJ's findings here, plaintiff asserts, is not a rational basis for finding him not credible.  What is relevant concerning the ALJ's determination, however, is that the record shows plaintiff had this impairment even during the period prior to when he alleges he became disabled, but nevertheless was able to work in spite of that impairment.  This indicates it is not as disabling as alleged.  A determination of severity at step two of the disability evaluation process, furthermore, is merely a *de minimis* screening device used to dispose of groundless claims, and, as such, does not in itself indicate the

presence of a disabling limitation, or a limitation that interferes very significantly with the ability to perform work-related activities. <u>Smolen</u>, 80 F.3d at 1290

The same is true in regard to plaintiff's headaches, again as noted by the ALJ. Plaintiff argues it was not proper to discount his credibility on the basis that the medical evidence in the record showed he experienced "at least some improvement with the headaches with medication." Tr. 23. But the ALJ may discount a claimant's credibility on the basis of medical improvement. <u>See</u> <u>Morgan v. Commissioner of Social Sec. Admin.</u>, 169 F.3d 595, 599 (9th Cir. 1999); Tidwell v. Apfel, 161 F.3d 599, 601 (9th Cir. 1998). Plaintiff speculates that the record is unclear as to the severity of his headaches and the effect they had – either alone or in combination with other impairments – on his ability to work. In fact the record is clear on this issue. It fails to establish they had any significant impact on his ability to perform work activities.

The ALJ also was proper in discounting plaintiff's credibility on the basis that his receipt of unemployment insurance compensation was inconsistent with his allegations of disability. <u>See</u> <u>Copeland v. Bowen</u>, 861 F.2d 536, 542 (9th Cir. 1988) (receipt of unemployment benefits is valid reason for discounting claimant's credibility, as it indicates claimant considered himself to be capable of work and that he held himself out as being available therefor). Plaintiff argues this should not be used as a basis for discounting his credibility, since he received his unemployment insurance benefits after he stopped working, and before he realized he was not going to get any better. But, as defendant notes, the point is that <u>at the time</u> he applied for unemployment benefits, he was deemed to have considered and to have held himself out as being available for and capable of work.

The fact that plaintiff did not apply for Social Security benefits until later, therefore, is irrelevant. Indeed, at the time he applied for Social Security benefits, plaintiff stated he became

ORDER - 17

unable to work back on December 31, 2004, even though his representative admitted he received

unemployment insurance benefits in early 2005, thereby indicating plaintiff considered himself

able to work during the alleged period of disability.  In late October 2005, furthermore, plaintiff

himself told Mr. Conklin that he did work for "about a year until June of '05, . . . lifting a lot of

heavy molds and breaking up and setting up of these molds." Tr. 257.

The undersigned does agree that the fact that plaintiff told Dr. Sattar that he had spinal

stenosis is not a clear and convincing reason for discounting his credibility, as plaintiff is not a

physician or medical expert, and thus may not have been entirely clear as to what his underlying

medical condition was at the time.  Nevertheless, the fact that one of the reasons for discounting

plaintiff's credibility was improper, does not render the ALJ's credibility determination invalid,

as long as that determination is supported by substantial evidence in the record, as it is in this

case. See Tonapetyan, 242 F.3d at 1148.  Indeed, as noted above, the ALJ also properly noted

that plaintiff's complaints of poor balance were supported by the objective medical evidence in

the record. Tr. 23; see Regennitter, 166 F.3d at 1297.

III.    The ALJ Properly Evaluated the Lay Witness Evidence in the Record

Lay testimony regarding a claimant's symptoms "is competent evidence that an ALJ must

take into account," unless the ALJ "expressly determines to disregard such testimony and gives

reasons germane to each witness for doing so." Lewis v. Apfel, 236 F.3d 503, 511 (9th Cir.

2001).  In rejecting lay testimony, the ALJ need not cite the specific record as long as "arguably

germane reasons" for dismissing the testimony are noted, even though the ALJ does "not clearly

link his determination to those reasons," and substantial evidence supports the ALJ's decision.

Id. at 512.  The ALJ also may "draw inferences logically flowing from the evidence." Sample,

694 F.2d at 642.

ORDER - 18

The record contains a written statement from plaintiff's mother, in which she sets forth her observations of plaintiff's symptoms and limitations. See Tr. 63-69.  With respect to those observations, the ALJ found in relevant part as follows:

> The claimant's mother reported in 2006 that he could lift maybe 20 pounds and walk two blocks.  She stated that he did not spend time with others, in person, on the telephone or on the computer.  She described significant limitations . . . That report is accorded little evidentiary weight, as it is inconsistent with other evidence of record.  For example, at that time the claimant had a girlfriend who either lived with him . . . or lived next door.  In addition, the claimant has remained in contact with his children.  It is understandable that the claimant's mother would have an interest in the successful outcome of his disability claim, particularly as she is providing services and place for him to live.  It is likely her secondary gain motivation influenced her report.

Tr. 22.  In contesting the ALJ's findings here, plaintiff takes issue with the last reason the ALJ gave for rejecting his mother's statement.

The undersigned agrees it was questionable for the ALJ to reject plaintiff's mother's statement on the basis that she likely was motive by secondary gain.  Family members who are in a position to observe a claimant's symptoms and daily activities are deemed to be competent to testify as to those symptoms and activities. See Dodrill v. Shalala, 12 F.3d 915, 918-19 (9th Cir. 1993).  In Sprague v. Bowen, 812 F.2d 1226 (9th Cir. 1987), the Ninth Circuit indicated that the existence of a "close relationship" between the lay witness and the claimant, and the potential to be "influenced" by the "desire to help," can be viewed as being "germane" to that particular lay witness. Id. at 1232 (citing 20 C.F.R. § 404.1513(e)(2)).  Later, in Greger v. Barnhart, 464 F.3d 968 (9th Cir. 2006), the Court of Appeals again found the ALJ in that case properly considered the close relationship between the claimant and his girlfriend, and the possibility that she might have been influenced by the desire to help him. Id. at 972.

In Bruce v. Astrue, 557 F.3d 1113 (9th Cir. 2009), however, the Ninth Circuit reiterated

ORDER - 19

its position that "friends and family members in a position to observe a claimant's symptoms and daily activities are competent to testify as to [his or] her condition." Id. at 1116 (quoting Dodrill, at 1918-19.  The Court of Appeals did note its prior decision in Gregor, but nevertheless went on to find the ALJ erred in rejecting the lay witness testimony in Bruce on the basis of that witness's close relationship with the claimant, without explaining this difference in its two rulings. See id. (citing 464 F.3d at 972).

The only explanation the undersigned can glean from reviewing those rulings is that in Greger there appears to have been at least some evidence – although the Ninth Circuit did not discuss exactly what that evidence was – of the lay witness "possibly" being "influenced by her desire to help" the claimant in addition to the "close relationship" she had with him (464 F.3d at 972) – while in Bruce, no such evidence existed.  More recently, in Valentine v. Commissioner of Social Security, 574 F.3d 685 (9th Cir. 2009), the Court of Appeals stated that "evidence that a specific spouse exaggerated a claimant's symptoms *in order* to get access to his disability benefits, as opposed to being an 'interested party' in the abstract, might suffice to reject that spouse's testimony." Id. at 694 (emphasis in original).

Here, however, there is no evidence in her written statement or elsewhere in the record that plaintiff's mother exaggerated plaintiff's symptoms or limitations in order to obtain access to his disability benefits.  In addition, there is no evidence that plaintiff's mother had a desire to seek any remuneration for any expenses she may have incurred for the "services" and "place for him to live" she provided.  Indeed, in terms of the latter, it appears that plaintiff's mother merely provided plaintiff space on her property for him to live in his motor home (Tr. 63), and that the only "service" she performed for him was in regard to cooking (Tr. 65).  These minimal efforts to "help" plaintiff are hardly indicative of a secondary gain motive.

ORDER - 20

On the other hand, the undersigned finds the ALJ validly noted the inconsistency between the limitations set forth by plaintiff's mother in her statement and other evidence in the record. For example, the mental and physical limitations plaintiff's mother described in that statement (see Tr. 65 (plaintiff needed help with any lifting), 68 (plaintiff could lift maybe only 20 pounds, could walk for only couple blocks, could not pay attention for very long, and did not follow written instructions), 69 (plaintiff did not handle stress very well)) in general were more severe than the objective medical evidence in the record indicates (see Tr. 146, 148, 157, 166, 189, 222-23, 271, 319).  This was a valid basis upon which to discount plaintiff's mother's statement. See Bayliss, 427 F.3d at 1218; Lewis, 236 F.3d at 511; Vincent, 739 F.2d at 1395 (9th Cir. 1984); but see Bruce, 557 F.3d at 1116 (improper for ALJ to discredit testimony of claimant's wife as not supported by medical evidence in record).[6]

IV.     The ALJ Did Not Err in Assessing Plaintiff's Residual Functional Capacity

If a disability determination "cannot be made on the basis of medical factors alone at step three of the evaluation process," the ALJ must identify the claimant's "functional limitations and restrictions" and assess his or her "remaining capacities for work-related activities." SSR 96-8p, 1996 WL 374184 *2.  A claimant's RFC assessment is used at step four to determine whether he or she can do his or her past relevant work, and at step five to determine whether he or she can

---

[6] In so holding, the Ninth Circuit in Bruce relied on its prior decision in Smolen, which held that the ALJ improperly rejected the testimony of the claimant's family on the basis that medical records did not corroborate the claimant's symptoms, because in so doing the ALJ violated the Commissioner's directive "to consider the testimony of lay witnesses where the claimant's alleged symptoms are *unsupported* by her medical records." Bruce, 557 .3d at 1116 (citing 80 F.3d at 1289) (emphasis in original).  The Court of Appeals, however, did not address its earlier decisions in Bayliss, Lewis and Vincent, in which, as discussed above, it expressly held that "[o]ne reason for which an ALJ may discount lay testimony is that it conflicts with medical evidence." Lewis, 236 F.3d at 511 (citing Vincent, 739 F.2d at 1995); see also Bayliss, 427 F.3d at 1218.  Accordingly, although Bruce is the Ninth Circuit's most recent pronouncement on this issue, given that no mention of Bayliss, Lewis or Vincent was made in that case, and that none of the holdings in those earlier decisions concerning this issue were expressly reversed, it is not at all clear whether discounting lay witness evidence on the basis that it is not supported by the objective medical evidence in the record is no longer allowed.  Plaintiff, though, has not challenged this basis for discounting plaintiff's mother's statement.  Accordingly, the undersigned shall treat those earlier holdings as being still good law.

ORDER - 21

do other work. Id.  It thus is what the claimant "can still do despite his or her limitations." Id.

A claimant's residual functional capacity is the maximum amount of work the claimant is able to perform based on all of the relevant evidence in the record. Id.  However, a claimant's inability to work must result from his or her "physical or mental impairment(s)." Id.  Thus, the ALJ must consider only those limitations and restrictions "attributable to medically determinable impairments." Id.  In assessing a claimant's RFC, the ALJ also is required to discuss why the claimant's "symptom-related functional limitations and restrictions can or cannot reasonably be accepted as consistent with the medical or other evidence." Id. at *7.

Here, the ALJ assessed plaintiff with the following residual functional capacity:

> **. . . [T]he claimant has the residual functional capacity to perform light work . . . except he cannot reach overhead more than occasionally on the right and cannot perform jobs that require bilateral visual acuity.  He needs to avoid exposure to extreme cold, heat, fumes, dust and gases.  He needs to avoid moderate exposure to hazardous machinery and heights. He can understand, remember and carry out simple or complex tasks and he can make judgments in a work setting with occasional interactions with coworkers and supervisors and superficial interaction with members of the public.**

Tr. 22 (emphasis in original).  Plaintiff argues this RFC assessment was improper in light of the ALJ's failure to adequately reject a limitation to occasional handling and overhead reaching on the right documented in the record.  Although the undersigned finds the ALJ erred in regard to his evaluation of the medical evidence in the record concerning a right handling and reaching limitation, as discussed in greater detail in the next section that error is harmless in light of the testimony of the vocational expert.

The record contains a physical residual functional capacity assessment form completed by an individual who does not appear to be a medical source, in which that source found plaintiff to be limited to only occasional handling and only occasional overhead reaching on the right. Tr.

ORDER - 22

131, 135.  The ALJ stated in his decision that the source's "occasional reaching and handling on the right" limitations were not consistent with "the evidence of record," and therefore were not adopted, because they were "based on a diagnosis of carpal tunnel syndrome," while plaintiff's right should impingement syndrome only limited "his ability to reach overhead on the right." Tr. 25.  As noted by plaintiff, however, the ALJ appears to have misread the record, as no diagnosis of carpal tunnel syndrome was set forth on that form. See Tr. 128.

There is objective medical evidence in the record, furthermore, indicating the presence of handling limitations on the right.  For example, Lance W. Christiansen, D.O., found at least some limitation in handling in early March 2005. See Tr. 157.  Mr. Conklin noted moderate to marked limitations in plaintiff's ability to handle in the several physical evaluation forms he completed as well. See Tr. 195, 267, 282, 288.  While, as discussed above, the ALJ did properly reject Mr. Conklin's subsequent opinions that plaintiff was unable to perform full-time work, the ALJ did not specifically analyze the handling limitations noted in the prior evaluation forms. See Tr. 24. It is true that one examining physician, Justin J. Sherfey, D.O., failed to note any handling limitations in the two physical evaluation forms he completed in late November 2005, and early February 2006 (Tr. 166, 189), but given that the ALJ's decision does not contain any analysis of this conflicting evidence, the Court has no basis for determining if the substantial evidence in the record supports the ALJ's finding concerning handling.

As for plaintiff's assertion that the ALJ failed to properly include the limitations in regard to reaching on the right, the undersigned also finds the record does not clearly establish that such a limitation would be limited to an ability to engage in occasional overhead reaching on that side. It is true that the non-medical source discussed herein found plaintiff to be capable of overhead reaching on the right on an occasional basis (Tr. 131), and that Mr. Conklin opined that he could

ORDER - 23

occasionally use his right hand/arm (Tr. 422). Dr. Christiansen, however, found in early March 2005, that plaintiff was unable to "lift/use arms over head" (Tr. 157), and Dr. Sherfey, likewise opined in late November 2005, that plaintiff should engage in "[n]o overhead activity" (Tr. 166), and in early February 2006, that he should perform "[n]o [a]bove shoulder [a]ctivity" (Tr. 189). Again, since the ALJ gave no reasons for discounting the more severe limitations noted by Drs. Sherfey and Christiansen, it is unclear whether the ALJ appropriately assessed plaintiff's right reaching limitations.

V.       The ALJ's Step Five Determination Was Proper

       If a claimant cannot perform his or her past relevant work, at step five of the disability evaluation process the ALJ must show there are a significant number of jobs in the national economy the claimant is able to do. Tackett v. Apfel, 180 F.3d 1094, 1098-99 (9th Cir. 1999); 20 C.F.R. § 404.1520(d), (e), § 416.920(d), (e). The ALJ can do this through the testimony of a vocational expert or by reference to the Commissioner's Medical-Vocational Guidelines (the "Grids"). Tackett, 180 F.3d at 1100-1101; Osenbrock v. Apfel, 240 F.3d 1157, 1162 (9th Cir. 2000).

       An ALJ's findings will be upheld if the weight of the medical evidence supports the hypothetical posed by the ALJ. Martinez v. Heckler, 807 F.2d 771, 774 (9th Cir. 1987); Gallant v. Heckler, 753 F.2d 1450, 1456 (9th Cir. 1984). The vocational expert's testimony therefore must be reliable in light of the medical evidence to qualify as substantial evidence. Embrey v. Bowen, 849 F.2d 418, 422 (9th Cir. 1988). Accordingly, the ALJ's description of the claimant's disability "must be accurate, detailed, and supported by the medical record." Embrey, 849 F.2d at 422 (citations omitted). The ALJ, however, may omit from that description those limitations he or she finds do not exist. Rollins v. Massanari, 261 F.3d 853, 857 (9th Cir. 2001).

ORDER - 24

At the hearing, the ALJ posed a hypothetical question to the vocational expert, which contained substantially the same limitations as the ALJ included in his assessment of plaintiff's residual functional capacity. Tr. 487-88.  In response to that hypothetical question, the vocational expert testified that an individual with those limitations, and who had the same education and was in the same age group as plaintiff, could perform the following jobs: cabinet assembler (Dictionary of Occupational Titles ("DOT") 763.684-010), assembler (DOT 706.684-022) and basket filler (DOT 529.687-010). Tr. 488-89.  Based on the vocational expert's testimony, the ALJ found plaintiff to be capable of performing other work existing in significant numbers in the national economy. Tr. 26.

Plaintiff argues the ALJ erred in finding him to be capable of performing such other jobs. First, plaintiff notes the vocational expert testified that the assembler job required "some bilateral dexterity." Tr. 491.  Given the ALJ's error in evaluating the medical evidence in the record with respect to plaintiff's potential handling limitations on the right, it is unclear whether he would be able to perform this job.  Plaintiff also argues the ALJ erred in finding he was able to perform the job of cabinet assembler, because while the vocational expert testified that job was performed at the light exertional level (see Tr. 488), the DOT defines it as requiring medium work (see DOT 763.684-010).  The undersigned agrees the ALJ erred here as well.

The ALJ may rely on vocational expert testimony that "contradicts the DOT, but only insofar as the record contains persuasive evidence to support the deviation."  Johnson v. Shalala, 60 F.3d 1428, 1435 (9th Cir. 1995).  The ALJ, furthermore, has the affirmative responsibility to ask the vocational expert about possible conflicts between her testimony and information in the DOT. Haddock v. Apfel, 196 F.3d 1084, 1091 (10th Cir. 1999); SSR 00-4p, 2000 WL 1898704. Accordingly, before relying on evidence obtained from a vocational expert to support a finding

ORDER - 25

of not disabled, the ALJ must "elicit a reasonable explanation for any discrepancy" with the DOT. Haddock, 196 F.3d at 1087; SSR 00-4p, 2000 WL 189704 *1.  The ALJ also must explain how the discrepancy or conflict was resolved. SSR 00-4p, 2000 WL 189704 *4.  Here, however, the vocational expert did not explain why his testimony differed from the DOT, nor did the ALJ elicit a reasonable explanation therefore.

The undersigned disagrees with plaintiff, though, that the ALJ erred in finding him to be able to perform the job of basket filler.  It is true that nothing in the DOT's description of that job indicates whether or not it could be performed by an individual with a diminished ability to use his dominant right upper extremity. See DOT 529.687-010.  The vocational expert, however, testified that the basket filler job "would be more accommodating for a person that just had one hand," since – unlike the job of assembler requiring at least some bilateral dexterity – it involves just "picking defective items off . . . a conveyor belt." Tr. 491.  The vocational expert went on to explain that although "[t]he DOT does not reference bilateral issues . . . for analyzing jobs[,] . . . if a person was able to pick defective items off a conveyor belt, depending on [that person's] good hand usage, [he or she would] probably be able to perform that [job]," even in regard to those persons who were limited in the use of their dominant hand, as that hand still could be used "for an assist." Id.

Plaintiff argues that it is difficult to imagine how the job of basket filler would not be impacted by a limitation in reaching and handling with the dominant upper extremity.  But the undersigned finds the vocational expert's explanation for her deviation from the information on that job contained in the DOT to be sufficient.  In addition, as indicated above, given that the vocational expert testified that the job of basket filler could be performed by using essentially only one hand, which also could be the non-dominant hand, the ALJ's error in evaluating the

evidence in the record concerning plaintiff's handling and reaching limitations is inconsequential to the ALJ's step five determination, and therefore harmless. See Stout v. Commissioner, Social Security Admin., 454 F.3d 1050, 1055 (9th Cir. 2006) (error harmless where it is non-prejudicial to claimant or irrelevant to ALJ's ultimate disability conclusion).

CONCLUSION

Based on the foregoing discussion, the Court finds the ALJ properly determined plaintiff to be not disabled.  Accordingly, the ALJ's decision hereby is AFFIRMED.

DATED this 29th day of April, 2010.

Karen L. Strombom
United States Magistrate Judge

ORDER - 27